TORGENSON LAW
John P. Torgenson (No. 023505)
Jon T. Drago (No. 034194)
333 W. Roosevelt St.
Phoenix, AZ 85003
Telephone: (602) 759-0012
Facsimile: (602) 429-8120
jtorgenson@torgensonlaw.com
jdrago@torgensonlaw.com

BRADY
Jonathan E. Lowy (pro hac to be filed)
Erin Davis (pro hac to be filed)
Christa Nichols (pro hac to be filed)
840 First Street, N.E., Suite 400
Washington, DC 20002
Telephone:    202-370-8104
jlowy@bradyunited.org
edavis@bradyunited.org
cnichols@bradyunited.org

*Attorneys for Plaintiff Carlos Daniel Travieso*

## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Carlos Daniel Travieso, | Case No.: |
| Plaintiff, | |
| v. | COMPLAINT |
| GLOCK, Inc., a Georgia Corporation; GLOCK Ges.m.b.H, an Austrian Corporation; ABC Firearm Dealer Corporation; 123 Firearm Distributor Corporation, and DOES 1-50 | (Jury Trial Demanded) |
| Defendants. | |

Plaintiff CARLOS DANIEL TRAVIESO hereby alleges as follows:

## **PARTIES**

1    1.    Plaintiff, CARLOS DANIEL TRAVIESO ("Carlos"), is an adult individual

2    who resides at 11322 W. Vernon Ave., Avondale, Arizona.

3    2.    Upon information and belief, Glock, Inc. is a corporation organized and

4    existing under the laws of Georgia, with its principal place of business in Smyrna,

5    Georgia.  Glock designed, manufactured, and sold the handgun used in the unintentional

6    shooting of Carlos. At all times relevant to this complaint, Glock had continuous and

7    systematic contacts with the State of Arizona by delivering its products into the stream of

8    commerce with the expectation that the products would reach users within the State of

9    Arizona.  Upon information and belief, Glock had minimum contacts with the State of

10   Arizona.   The causes of action asserted herein arise from such contact and business

11   operations.

12   3.    Defendant Glock Ges.m.b.H is a corporation organized and existing under

13   the laws of the nation of Austria with its principal place of business in Austria. At all

14   times relevant to this complaint, Glock Ges.m.b.H designed, manufactured, assembled

15   and/or imported guns which were marketed, distributed and/or sold in the United States,

16   and which were distributed, marketed, sold and/or possessed within Arizona, including the

17   handgun used in the unintentional shooting of Carlos.  Glock Ges.m.b.H had continuous

18   and systematic contacts with the State of Arizona by delivering their products into the

19   stream of commerce with the expectation that the products would reach users within the

20   State of Arizona.  Upon information and belief, Glock had minimum contacts with the

State of Arizona.   The causes of action asserted herein arise from such contact and business operations.

4.      Upon information and belief, Defendant ABC Gun Dealer is a corporation, partnership, limited liability company, individual, or other incorporated or unincorporated association whose true name is presently unknown to Plaintiff, but who is or may be liable to Plaintiff for his Complaint.  If and when the true name of such fictitious defendant becomes known, Plaintiff will seek leave of the Court to amend his Complaint to set forth ABC Gun Dealer's true name, capacity and relationship.

5.      Upon information and belief, Defendant 123 Gun Distributor is a corporation, partnership, limited liability company, individual, or other incorporated or unincorporated association whose true name is presently unknown to Plaintiff, but who is or may be liable to Plaintiff for his Complaint.  If and when the true name of such fictitious defendant become known, Plaintiff will seek leave of the Court to amend his Complaint to set forth ABC Gun Distributor's true name, capacity and relationship.

6.      Upon information and belief, DOES 1-50 are corporations, partnerships, limited liability companies, individuals, or other incorporated or unincorporated associations whose true names are presently unknown to Plaintiff, but who are or may be liable to Plaintiff for his Complaint.  If and when the true names of such fictitious Defendants become known, Plaintiff will seek leave of the Court to amend his Complaint to set forth the parties' true names, capacities and relationships.

**JURISDICTION**

7.    Jurisdiction is properly conferred by 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy, upon information and belief, is well in excess of $75,000.

8.    Venue is proper under § 1391(b)(2) because, upon information and belief, a "substantial part of the events or omissions giving rise to the claim" occurred in this district. The events that form the basis of this complaint occurred in Gila County on March 17, 2018.

## NATURE OF THE SUIT

9.    This is a civil action arising from the decisions and actions of Glock, Glock Ges.m.b.H (referred to collectively as "Glock"), ABC Firearms Dealer, and 123 Firearm Distributor, and DOES 1-50 (hereinafter "Defendants"), to unreasonably and negligently design, market, distribute, and sell to the general public a lethal product without feasible, and adequate life-saving safety features.

10.    Defendants are not liable simply because they made and sold a gun, a product that is capable of causing lethal injury.  Defendants are liable because they chose to design, manufacture, market, distribute, and sell that product in an unreasonably and unnecessarily dangerous manner, without feasible safety features and warnings that would have prevented Carlos from being shot and injured.

11.    Defendants' tortious conduct foreseeably caused catastrophic injuries to Carlos, who was just 18 years old at the time.

12.     For over a century, the firearms industry, including Defendants, have been well aware of the grave risk of injury and death their products pose to gun owners, their families, visitors to their homes, and others when unauthorized, untrained, or irresponsible persons obtain access to their firearms – and they have been aware of feasible safety features that can prevent many of gun injuries and deaths.

13.     Defendants know that many of their customers will store guns that are unlocked and loaded, accessible to children, and that as a result many children and adults die or are injured from those firearms unless the guns are made with safety features to prevent those deaths and injuries.

14.     Defendants know that guns could easily be made and sold with safety features that would prevent some of these deaths, and would greatly reduce the risk that people will be injured or killed from unintentional shootings by children, as well as adults.

15.     For example, Defendants know that many children – and adults – often are deceived by the design of semiautomatic firearms to believe that they are unloaded after the ammunition magazine is removed, even though a live round may remain in the chamber.

16.     Defendants know that many people, often children, die or are seriously wounded when someone fires a gun he or she thinks is unloaded because there is no magazine in the gun, but, unbeknownst to the person handling the gun, a bullet is in the chamber.

17.    For over a century, magazine disconnect safeties have been an easy and inexpensive fix to this problem that would save lives.

18.    Magazine disconnect safeties are devices that prevent a gun from firing when the magazine is removed.

19.    Magazine disconnect safeties were invented over a century ago precisely to prevent the risks – well known even then – that people are killed in unintentional shootings with guns that were thought to be unloaded.

20.    Defendants have known or should have known that firearms with a short trigger pull, no magazine disconnect safety, no manual safety, or inadequate loaded chamber indicators will foreseeably result in unintentional discharges, especially in the hands of a novice or child.

21.    These safety features would reduce the unsafe character of the firearm (and the high degree of risk associated with it) without impairing its usefulness or making it too expensive to maintain its utility.

22.    When Defendants chose to design, manufacture, market, and sell the firearm used in the unintentional shooting of Carlos, they knew or should have known all of the above.

23.    Despite this knowledge, Defendants chose to design, manufacture, market, distribute, and sell firearms without feasible safety features that would prevent foreseeable deaths and injuries.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

24.    As a result of Defendants' negligent and otherwise tortious actions and choices, they placed the lives of its customers, and others at risk.

25.    As a result of Defendants' negligent and otherwise tortious actions and choices, Carlos was inadvertently and unintentionally shot at the age of 18 years old.

26.    The shooting left Carlos with complete paralysis of his lower body and legs.

27.    Arizona law provides a redress to Carlos for the damages caused by the Defendants' negligence and otherwise tortious conduct. Under Arizona law, the firearm used to shoot Carlos was negligently designed, manufactured, marketed, distributed, and sold, and its design and warnings were defective and unreasonably dangerous.

28.    The injury to Carlos was foreseeably caused by the Defendants' negligent and defective design and warnings.

29.    Carlos brings this suit to hold the companies accountable for their wrongful actions that caused his injury.

## FACTUAL ALLEGATIONS

**A.    The Shooting of Carlos Travieso.**

30.    On March 17, 2018, a Glock 9-millimeter semi-automatic handgun, model 19, generation 5 ("the handgun"), was in the vehicle of Carlos' church leader.  The church leader was driving several children home from a youth group camping in trip in Arizona.

31.    Upon information and belief, the handgun had not been modified in any significant way from the time it was manufactured by Glock and had the same safety

features – and lack of safety features and warnings – as it did when it was manufactured and sold by Glock.

32.    Carlos was one of the children traveling in the church leader's vehicle.

33.    A fourteen-year-old girl ("the girl"), who was also in the vehicle, came to possess the handgun.

34.    Upon information and belief, the girl knew that the ammunition magazine of the handgun had been removed.

35.    Upon information and belief, the girl was deceived into believing that the handgun was unloaded, because the magazine was removed, and there were no adequate indicators or warning to inform her that a live round remained hidden in the chamber.

36.    Unbeknownst to the girl, a live round remained in the chamber.

37.    While the girl possessed the gun, the gun discharged, firing the live round that remained hidden in the chamber.

38.    The live round discharged into Carlos's body, who was unintentionally shot in his back.

39.    Carlos suffered injuries including but not limited to the following:

(a) Acute Complete Paraplegia

(b) Placid Paraplegia

(c) Neurogenic Bladder

(d) Neurogenic Bowel

(e) Injury of the Diaphragm

(f) Complete Lesion at T7-T10 level of Thoracic Spinal Cord

(g) Fracture of T9-T10 Vertebra

(h) Left Diaphragm injury

(i) Gastric injury

(j) Left forearms injury

40.     No criminal charges have been filed against any party in connection with the shooting.

**B. Defendants Were Aware of The Need To Include Safety Features In Order To Prevent Foreseeable Injuries or Deaths.**

41.     Defendants could reasonably foresee that the guns they designed, manufactured, marketed, distributed, and sold would be stored, carried, and used in environments that include those in which children will be present and will gain access to these deadly weapons.

42.     Defendants knew or should have known that guns are not products, such as sophisticated industrial machines, intended and expected to be used only by specially educated and trained users in situations where children are not expected to be present and able to obtain access to them.

43.     As Defendants knew or should have known, it is common and highly foreseeable that guns will be stored such that they are accessible to children.

44.     For example, a study of data from the National Center for Health Statistics indicated that:

a.   a majority of gun owners living with children do not store their guns locked, unloaded, and separate from ammunition;

b.   approximately 40 percent do not store their guns locked in any manner;

c.   about 8.3 million children in the U.S. live in homes where a firearm is stored unlocked;

d.   2.6 million live in a home where the firearm is also stored loaded or with ammunition.

45.    Other studies have reached similar conclusions about high levels of unsecure gun storage where guns are accessible to children.

46.    Although there have been important initiatives to change the behavior of parents concerning guns and firearms storage, such efforts have not eliminated the problem of children accessing unsecure guns in the home or in other locations.

47.    Defendants knew or should have known that the guns they sold would be stored unlocked and accessible to children.

48.    As Defendants knew or should have known at all relevant times, failure to incorporate the safety features and adequate warnings discussed herein results in many unintentional shootings every year, such as when a child finds a gun and fires it, injuring or killing himself or another child.

49.    Data indicates that every day in the United States, an average of approximately one person aged 19 and under is killed, and 13 more are injured, in unintentional shootings.

50.     A study by the federal Center for Disease Control found that the U.S. leads the industrialized world in rates of gun-related deaths among children, with unintentional fatal shootings of children 0 to 14 years of age occurring here at rates 9 times higher than in the other 25 industrialized nations studied.

51.     Studies have found that most of these incidents occur when children obtain access to a loaded, unlocked gun without adult supervision.

52.     A substantial number of these deaths and injuries would be prevented if gun manufacturers equipped guns with safety features to prevent children from discharging them.

53.     As Defendants knew or should have known at all relevant times, handguns are involved in a disproportionately high number of unintentional shooting deaths, as compared to rifles and shotguns, and handguns are particularly likely to be stored unsafely.

54.     Defendants knew or should have known that advertising, marketing and messaging from the firearms industry misleads many people into incorrectly thinking that guns enhance safety and are more likely to save lives, even though studies have consistently shown for years that possession of a gun increases the risk of injury and death.

55.     Defendants knew or should have known that these misperceptions lead some people to buy and possess guns, with an inaccurately low assessment of the risks those guns pose, and an inaccurately high assessment of their safety benefits.

56.     Defendants knew or should have known that advertising, marketing and messaging by the firearms industry suggests that people need guns immediately accessible and useable in order to defend themselves and their families, and that these communications lead people to store guns unsafely, accessible to children.

57.     Defendants knew or should have known that these misperceptions make it more likely that people will store guns unsafely, accessible to children.

58.     Defendants knew or should have known that users of guns, and particularly children, would be deceived by its design to think that it was unloaded even though a live round was in the chamber.  And as a result, many people, including children, would be killed or seriously injured.

**C. The Glock Handgun's Lack of Safety Features.**

59.     This tragedy resulted from the negligent, reckless, unnecessarily and unreasonably dangerous actions of Defendants, including their design, manufacturing, marketing, distribution, and sale of a handgun without a magazine disconnect safety, effective loaded chamber indicator, internal lock, or other safety features that would have prevented it from being fired by a child or any other person who did not have proper authority or maturity to use it, or effective warnings.

60.     Any one of these feasible features would have prevented the shooting that injured Carlos.

61.     The handgun was designed and manufactured with a short trigger pull and without a manual safety, which results in increased instances of unintentional discharges, even when being handled by a trained professional.

62.     The handgun did not include feasible features in its design that could have prevented it from being fired when users were led to believe that it was unloaded because the ammunition magazine was removed.

63.     The handgun did not include feasible features that would prevent it from being fired by a child or other person without authorization to use it.

64.     The handgun did not include feasible features and warnings that would effectively alert users that a live round was in the chamber.

65.     It has long been technologically and economically feasible to design guns so that they include any of these features.

66.     For example, magazine disconnect safeties have been used in firearms for over 100 years, to prevent guns from firing when users think that the gun is unloaded because the ammunition magazine has been removed.

67.      Magazine disconnect safeties are used by many manufacturers, without incident or harm to legitimate, appropriate users.

68.     A 1910 patent for the magazine disconnect stated its intention "to insure absolutely against the dangerous unintentional firing sometimes liable to occur if the trigger is pulled after the magazine has been withdrawn in the belief that all cartridges have been removed from the arm with the magazine."

69.   At least as early as January 1958, the National Rifle Association recognized the life-saving potential of magazine disconnect safeties.

70.   The January 1958 issue of the NRA's *American Rifleman* magazine stated: "There is a magazine safety to prevent the gun being fired unless the magazine is in place, the idea being to prevent accidents caused by people thinking they have the gun when they have merely removed the magazine and left a cartridge in the chamber."

71.   Effective loaded chamber indicators are also feasible and, if effectively designed and manufactured, they can alert foreseeable users that a round is in the chamber, even if the magazine is removed.

72.   Adequate warnings, on the firearm and/or in other materials, can make the loaded chamber indicator more effective in warning users of a live round in the chamber.

73.   The recognition that a gun can and should be made so that children cannot operate it has been well known in the gun industry for more than a century.

74.   Manual safeties are a switch, button, or lever that, when set to the "safe" position, prevents the firing of a firearm.

75.   Manual safeties are a design feature that is available on most firearms and at the time of the manufacture of the handgun it was feasible to incorporate a manual safety.

76.   At the time of the manufacture of the handgun, it was also feasible to incorporate a lock into the gun that would secure it against unintentional use.

77.   Feasible locking devices include key-operated or push button locks similar to those that have been used on briefcases for decades.

78.     These and other locking devices have been successfully incorporated into guns, and would have prevented the shooting of Carlos.

79.     Locking systems that are internal or integrated into the gun are more effective and more likely to be used than locks that are separate and external and not part of the gun, such as a "trigger block" device that attaches over the gun's trigger to prevent it from being pulled or a bicycle-style "cable lock" device that is threaded through the gun barrel or chamber.

80.     Unlike external locks,  internal locks are always available to the gun user, reminding the gun user of its availability, and its inclusion indicates that the manufacturer believes it is very important to use.

81.     External locks also may be installed incorrectly, defeated by cutting or prying apart the lock, or lost after being removed from the gun.

82.     It was also feasible at the time of the manufacture of the handgun to incorporate "user recognition" technology in the gun, which prevents the gun from firing unless it "recognizes" the user.

83.     Childproof safeties, internal locking systems, user recognition systems, and other safety features to prevent the unintentional use of guns by children have been proposed and available to gun manufacturers for many years, and were feasible and known and available to Glock at the time it manufactured the handgun.

84.     Despite this fact, Glock failed to equip the handgun with any safety feature to prevent its unintentional use by children.

85.     For example, a trigger lock was patented in 1969.

86.     For over a decade, another major gun manufacturer, Taurus, has sold firearms with features that "engage[] with the turn of a special key to render the firearm inoperative, and is entirely contained within the firearm, with no parts to misplace." Only inserting and rotating the special key will render the gun ready to fire.

87.     Unlike a "trigger lock" that is not an integrated part of the gun, this integral lock cannot be installed incorrectly, pried apart, or lost after it is removed.

88.     Taurus has stated that the Taurus Security System was implemented "to help prevent unauthorized use by children," and that it is superior to "trigger block" style devices and other locks that are a separate, external device and not an integrated part of the gun and which can be lost when not in use.

89.     Taurus describes the internal lock as providing "additional security for home and family," as follows:

> Focusing on an ever-increasing awareness of firearms safety, Taurus International introduced in 1997 the internationally patented TAURUS SECURITY SYSTEM.
>
> This system renders a firearm inoperable by use of a special key. Taurus listened carefully to its customers and believes the TAURUS SECURITY SYSTEM responds to their desire for additional security for their home and personal defense handguns. This system, a world's first, gives the owner the option of storing their firearm in a locked condition, without cumbersome external devices.

90.     Technology equally or more effective than the Taurus Security System was feasible at the time the handgun was made and sold.

1

2

91.     Such technology would have secured the handgun against the unintentional use that occurred here.

3

**D. The Inadequate and Negligent Warnings of the Glock Handgun.**

4

5

6

7

8

9

10

92.     Upon information and belief, the warnings and instructions provided by Defendants failed to adequately educate and alert people as to the risks posed by their guns, including the foreseeable risks that children will obtain possession of guns, that guns will be unintentionally fired, that users will mistakenly believe that a gun is unloaded when the magazine is removed, and that shooting injuries and deaths will result.

11

12

13

93.     Upon information and belief, the handgun also did not include adequate warnings about the lack of a manual safety, the lack of a magazine disconnect, or the lack of other feasible safety features.

14

15

16

17

18

94.     Defendants' actions in marketing, distributing and selling the handgun with negligent warnings and design were outrageous, undertaken for bad motives including putting financial gain above safety, and undertaken with conscious disregard or reckless indifference to the interests of others and known dangers.

19

20

21

22

**FIRST CAUSE OF ACTION**

**(Strict Product Liability – Design Defect – Against Glock, Glock GmbH, ABC Gun Dealer, 123 Gun Distributor, and DOES 1-50)**

23

24

95.      Plaintiff hereby incorporates all previous paragraphs.

25

26

96.     ABC Gun Dealer and 123 Gun Distributor are the seller(s) of the handgun within the meaning of A.R.S. § 12-681(9).

- 17 -

97.    Glock is the manufacturer of the handgun within the meaning of A.R.S. § 12-681(3).

98.    The handgun is a product within the meaning of A.R.S. §12-681(4).

99.    Glock designed, engineered, manufactured, marketed, and/or sold the subject defective Glock handgun, and other defective Glock handguns.

100.    ABC Gun Dealer and 123 Gun Distributor marketed, serviced and sold the subject defective Glock handgun, and other defective Glock handguns.

101.    The handgun was defective in design, unreasonably dangerous, and lacked elements necessary to make it safe for its intended use because it lacked safety features including a magazine disconnect safety, a manual safety, an effective loaded chamber indicator, an internal locking system or another safety system that would prevent it from being unintentionally fired by a child, a safety feature that would personalize the gun and allow it to be fired only by recognized and authorized users, or a child-proof or child-resistant safety device, and effective and appropriate warnings.

102.    The handgun failed to perform as safely as an ordinary consumer would expect, in this incident, which was a reasonably foreseeable use of the handgun, because of the defective design, and as a result Carlos was shot.

103.    The risks of harm resulting from the defective design of the handgun were reasonably foreseeable.

104.    Alternative designs existed at the time of design, manufacture, and sale of the handgun that were safer, feasible, practical, and cost efficient.

105.   The danger posed by the defective design is severe, because injuries resulting from it are likely to be extremely serious, including catastrophic physical injuries or death.

106.   This danger has been known to manufacturers, distributors and dealers of the product for many years.

107.   The likelihood that the danger would occur is great.

108.   It is common and foreseeable for guns to be stored in an unsecure manner that enables children to obtain access to them and unintentionally discharge them.

109.   The risks created by, and harmful characteristics or consequences of, the handgun's design outweigh any benefits of the design.

110.   A safer design is feasible.

111.   There are no adverse consequences to the product or to the consumer that would result from the safer design.

112.   A safer design can eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

113.   It is feasible for the manufacturer to spread any costs of a design change through the price of the product or liability insurance.

114.   A reasonable person would conclude that the probability and seriousness of harm caused by the handgun outweigh the burden of cost of taking the safety precautions addressed herein.

115.   Defendants failed to adopt safety precautions proportionate to the magnitude of the expected risk of the handgun.

116.   Upon information and belief, the handgun at issue was defective and in an unreasonably dangerous condition when it left the hands of Glock, ABC Gun Dealer and 123 Gun Distributor, and remained defective and unreasonably dangerous at all times thereafter until ultimately causing Carlos's severe and permanent injuries.

117.   The handgun did not undergo any substantial change after the time of its manufacture, and was expected to and did reach the public without substantial change.

118.   At the time the handgun was placed into the stream of commerce, it was or should have been reasonably expected and foreseeable that it would be used in the manner and application in which it was used at the time of the unintentional shooting that resulted in Carlos's injuries.

119.   Defendants placed the handgun into the stream of commerce and are strictly liable for the injuries and damages caused by the defective design and unreasonably dangerous condition of the handgun.

120.   Defendants' actions and inactions were direct, legal, and proximate causes of and substantial factors in causing the shooting of Carlos and his severe and permanent injuries and damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

**(Strict Product Liability – Failure to Warn/Information
Defect – Against Glock, Glock GmbH, ABC Gun Dealer, 123
Gun Distributor, and DOES 1-50)**

121.   Plaintiff hereby incorporates all previous paragraphs.

122.   ABC Gun Dealer and 123 Gun Distributor are the seller(s) of the handgun within the meaning of A.R.S. § 12-681(9).

123.   Glock is the manufacturer of the handgun within the meaning of A.R.S. § 12-681(3).

124.   The handgun is a product within the meaning of A.R.S. §12-681(4).

125.   Glock designed, engineered, manufactured, marketed, and/or sold the subject defective Glock handgun, and other defective Glock handguns.

126.   ABC Gun Dealer and 123 Gun Distributor marketed, serviced and sold the subject defective Glock handgun, and other defective Glock handguns.

127.   At all relevant times, Defendants were subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury. Defendants had a duty to exercise reasonable care in designing, manufacturing, marketing, distributing and selling its product to protect against foreseeable risk of injury.

128.   Defendants could have and should have included stronger, more detailed, and more prominent language and materials to effectively inform potential users as to the risks of firearms and the need to store them safely.

129.   Glock also provided inadequate warnings on the firearm itself, including failing to effectively inform foreseeable users that a live round could be in the chamber and could be fired after the magazine is removed, and to have an effective loaded chamber indicator prominently and clearly inform and alert users when the chamber was loaded.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

130.    For example, the handgun's loaded chamber indicator is barely noticeable and, certainly to a child or untrained person, unintelligible, as pictured in the exemplar below:



131.    Whereas, it was feasible to place a specific warning on the handgun itself to identify the loaded chamber indicator's purpose and to identify when the chamber is loaded, as pictured in the exemplar below:



132.    Placing a similar or more effective warning on the loaded chamber indicator is feasible, there are no adverse consequences to the product or to the consumer that

would result from the safer design that includes such a warning, the safer design can eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility, and it is feasible for the manufacturer to spread the cost through the price of the product or liability insurance.

133.   A reasonable person would conclude that the probability and seriousness of harm caused by the handgun outweigh the burden of cost of taking the safety precautions and warnings addressed herein.

134.   Defendants failed to adopt safety precautions and warnings proportionate to the magnitude of the expected risk of the handgun and failed to apprise users of the existence and seriousness of the potential dangers.

135.   At the time the handgun was placed into the stream of commerce, it was or should have been reasonably expected and foreseeable that it would be used in the manner and application in which it was used at the time of the unintentional shooting that resulted in Carlos's injuries.

136.   Here, the shooter thought the handgun was unloaded because the magazine clip was not in it.

137.   Had the loaded chamber indicator effectively provided the requisite warning to the girl that the handgun was loaded, Carlos would not have be shot and injured.

138.   Defendants placed the handgun into the stream of commerce and are strictly liable for the injuries and damages caused by the failure to warn and failure to provide information on the defective condition of the handgun.

139.   The failure of Defendants to warn or protect against this dangerous use or misuse of the product was a direct, legal, and proximate cause of and substantial factor in causing the shooting of Carlos and his severe and permanent injuries and damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**(Negligent Design – Against Glock, Glock GmbH, ABC Gun Dealer, 123 Gun Distributor, and DOES 1-50)**

140.   Plaintiff hereby incorporates all previous paragraphs.

141.   At all relevant times, Defendants were subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.   Defendants had a duty to exercise reasonable care in designing, manufacturing, marketing, distributing, and selling its product to protect against foreseeable risk of injury.

142.   Defendants breached their duty not to expose others to reasonably foreseeable risks of injury by designing, manufacturing, marketing, distributing, and selling the handgun without safety features including a magazine disconnect safety, a manual safety, an effective loaded chamber indicator, an internal locking system, or other safety system that would prevent it from being fired by a child or other unauthorized person, a safety feature that would personalize the gun and allow it to be fired only by recognized and authorized users, or a child-proof or child-resistant safety device, and effective and appropriate warnings.

143.   Defendants' breach of their duties not to expose others to reasonably foreseeable risks of injury was the direct, legal, and proximate cause of and substantial

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

factor in the shooting of Carlos and his severe and permanent injuries and damages, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

**(Negligent Warnings and Marketing – Against Glock, Glock GmbH, ABC Gun Dealer, 123 Gun Distributor, and DOES 1-50)**

144.   Plaintiff hereby incorporates all previous paragraphs.

145.   At all relevant times, Defendants were subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.  Defendants therefore had a duty to exercise reasonable care in distributing and selling guns and to refrain from engaging in any affirmative activity creating reasonably foreseeable risks of injury to others.

146.   Defendants breached their duty not to expose others to reasonably foreseeable risks of injury by negligently marketing guns, and by misleading consumers as to the risks and benefits of handguns.

147.   Defendants could have and should have included strong, detailed, and prominent language and materials to effectively inform potential users as to the risks of firearms and the need to store them safely.

148.   Defendants also negligently provided inadequate warnings on the firearm itself, including by failing to inform foreseeable users that a live round could be in the chamber and could be fired after the magazine is removed, and to have a loaded chamber indicator prominently and clearly inform and alert users when the chamber was loaded.

149.  For example, the handgun's loaded chamber indicator is barely noticeable and, certainly to a child, unintelligible.

150.  It was feasible to place a specific warning on the handgun itself to identify the loaded chamber indicator's purpose and to identify when the chamber is loaded.

151.  Placing such a warning on the loaded chamber indicator is feasible, there are no adverse consequences to the product or to the consumer that would result from the safer design that includes such a warning, the safer design can eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility, and it is feasible for the manufacturer to spread the cost through the price of the product or liability insurance.

152.  Here, the shooter thought the handgun was unloaded because the magazine clip was not in it.  Had the loaded chamber indicator provided the requisite warning to the girl that the handgun was loaded, Carlos would not have be shot and injured.

153.  A reasonable person would conclude that the probability and seriousness of harm caused by the handgun outweigh the burden of cost of taking the safety precautions and warnings addressed herein.  Defendants failed to adopt safety precautions and warnings proportionate to the magnitude of the expected risk of the handgun.

154.  The failure of Defendants to warn or protect against this dangerous use or misuse of the product was a direct, legal, and proximate cause of and substantial factor in causing the shooting of Carlos and his severe and permanent injuries and damages, in an amount to be proven at trial.

# FIFTH CAUSE OF ACTION

**(Punitive Damages – Against Glock, Glock GmbH, ABC Gun Dealer, 123 Gun Distributor, and DOES 1-50)**

155.   Plaintiff hereby incorporates all previous paragraphs.

156.   Defendants knew or should have known that their guns end up in the hands of children.

157.   Defendants also knew, or should have known, that because of the design and lack of warnings on their guns, children would unintentionally discharge their guns.

158.   Defendants also knew, or should have known, that people, including children, would be killed or severely injured because of these defects.

159.   Despite this knowledge, Defendants continued to choose to design, manufacture, market, distribute, and sell firearms without feasible and affordable safety features that could prevent foreseeable deaths and injuries, including the harm incurred by Carlos.

160.   Defendants knew or should have known, but consciously disregarded, a substantial risk that significant harm might occur to Carlos and to others.

161.   Defendants knew or should have known that children and others would foreseeably die, or suffer catastrophic injuries, unless Defendants used reasonable care or included feasible safety features and warnings.

162.   Defendants nonetheless chose to act negligently, recklessly, and wantonly, in order to maximize profits.

163.   Defendants' willful and wanton disregard of the interests and well-being of others, including Carlos, was guided by evil motives.

164.   Defendants pursued a course of conduct to serve their own financial interests despite knowing that it was probably that significant harm could be caused by the use of the firearm by a minor, like the permanent and severe harm incurred by Carlos.

WHEREFORE, Plaintiff prays for judgment against the Defendants and each of them, as follows:

A.  For general and compensatory damages in an amount to be proven at trial;

B.  For special damages due to loss of income and medical expenses in an amount to be proven at the time of trial;

C.  For damages for the emotional distress, pain and suffering, psychological and mental anguish suffered by Carlos;

D.  For Plaintiff's loss of consortium;

E.  For punitive damages against all Defendants;

F.  For Plaintiff's costs of suit; and

G.  For such other relief as this Court deems just and proper.


DATED this 12th day of March, 2020.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

TORGENSON LAW


By  /s/ John P. Torgenson
    John P. Torgenson
    Jon T. Drago
    333 W. Roosevelt Street
    Phoenix, AZ  85003
    Telephone:  (602) 759-0012
    Facsimile: (602) 429-8120
    jtorgenson@torgensonlaw.com
    jdrago@torgensonlaw.com

    *Attorneys for Plaintiff Carlos Daniel Travieso*


BRADY


By  /s/ Jonathan E. Lowy
    Jonathan E. Lowy (admission pending)
    Erin Davis
    Christa Nichols
    840 First Street, N.E., Suite 400
    Washington, DC 20002
    Telephone: 202-370-8104
    jlowy@bradyunited.org
    edavis@bradyunited.org
    cnichols@bradyunited.org
    *Attorneys for Plaintiff Carlos Daniel Travieso*